IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AARON GREY,

                Petitioner,

        vs.

M. D. McDONALD, Warden, High Desert State Prison,

              Respondent.

No. 2:10-cv-01257-JKS

MEMORANDUM DECISION

Aaron Grey, a state prisoner appearing *pro se*, filed a Petition for Habeas Corpus under 28 U.S.C. § 2254.  Grey is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the High Desert State Prison.  Respondent has answered, and Grey has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

Grey was convicted by a jury in the Sacramento County Superior Court of attempted murder, Cal. Penal Code §§ 664/187(a), and discharging a firearm from a vehicle, Cal. Penal Code § 12034(c).  The jury also found that Grey had personally discharged the firearm, causing great bodily injury, Cal. Penal Code § 12022.53(d), but that the gang enhancement allegation, Cal. Penal Code § 186.22(b)(1), was untrue.  In September 2007 the trial court denied Grey's motion for a new trial and sentenced Grey to an indeterminate prison term of twenty-five years to life.  The California Court of Appeal, Third Appellate Division, affirmed Grey's conviction and

sentence in an unpublished decision,[1] and the California Supreme Court denied review on

April 1, 2009.  Grey filed a petition for habeas relief in the Sacramento County Superior Court on

January 25, 2010, which was denied on March 18, 2010.  The record does not reflect that Grey

sought further post conviction collateral relief in the California state courts.  Grey timely filed his

Petition for relief in this Court on May 16, 2010.

        The factual basis underlying Grey's conviction, as recited by the California Court of

Appeal:

### Prosecution's Case

        At approximately 8 p.m. on October 10, 2006, V. was in a parked truck at a
store waiting for her husband (the victim) to finish shopping; her baby daughter and
her teenaged daughter Y. were with her.  V. heard Y. telling someone that Y. "wasn't
looking at her," and then V. heard a girl from a car parked next to V.'s truck saying
"stuff" to Y, using "foul language."  V. testified that both girls were "mouthing off
to each other" and being rude.  Y. got out of the truck and asked the other girl why
she was calling out names, but got back in the truck when V. told her to.  Then a
"guy" from the car told V. to shut up, called her names, and said "he was calling
some people, I guess to beat me up.  [¶]  He said that he—he was going to kill me,
my daughter, my baby.  And then he said after that, bring your husband, I got
something for him, too."  V., when reminded of her statement to police, conceded
that the man had mentioned the "Piru" gang.  She identified defendant in court as this
man, and testified he had had a "grill," a shiny gold plate on his teeth.  After the
victim returned to the truck, [Grey] "called my daughter names and said that, come
out [of] the car and fight my sister or girlfriend, whatever she was to him.  And my
husband didn't pay no mind and drove away.  [¶]  And they threw a milkshake at the
window.  We went home."  [Grey] had said, "let the bitch come out of the car and
fight me."  After they unloaded groceries at home, V.'s husband went back to the
store with M., their 17-year-old son.
        Y. testified she had turned 16 years old the month before this event.  She first
noticed a car next to her family's truck, when someone began yelling at her, calling
her "the B word and just saying a lot of stuff[.]"  Y. got out of the truck, mad and
expecting a fight, and called the girl a bitch, but when another female began yelling
at her, saying things like "you are messing with my sister," and her mother told her
to get back in the truck, Y. returned to the truck.  The females in the car "started
cussing and then they started cussing out my mom, calling her a fat bitch, and that I

---

        [1] *People v. Grey*, No. C056825, 2008 WL 5394045 (Cal. Ct. App. Dec. 29, 2008).

was a bitch and my little sister was a bitch." A man with braids and a gold grill on his teeth "said that we were bitches and that we needed to shut up, and . . . I got something for you and your mom and your little sister, and that's it." "He said something about it's Piru or something like that," and "stars up;" Y. used to know a boy in the gang and he would use that expression, so she understood this to mean the man was also in the gang, which frightened her. When her father arrived and they drove off, one of the girls threw a milkshake at their truck. Her father grew mad on the way home, and left the house with her brother. She testified her father took pride in his truck and would be upset by someone throwing a milkshake on it.

The victim, Y.'s father, testified that after he loaded the groceries in his truck and began to drive away from the store, a man told him "to take my [fucking bitch] daughter out of the car." The man was wearing a red jacket and had gold teeth. As the victim continued to back his truck out of the parking space, "Some females came out and started throwing stuff at the truck, at that time I was afraid."

After unloading the groceries at home, the victim went back to the store because he had forgotten an item, and he took his son M. with him. He also testified that he had it in his mind to confront the man. He drove to the other car and conceded that photographs showed he parked so as to block it, though he did not remember doing so. This would have been about 25 minutes after he left the parking lot. The victim asked the man why he disrespected the victim's wife. He may have used foul language while asking this question, and asked the man to get out of his car, and he may have punched the man. Then the victim stepped back from the man's car window and "felt something hot." Later he saw a scratch on his truck.

The victim had been shot in the shoulder.

While at the hospital, the victim told an officer he became angry when he heard that a female in a white sweater had "disrespected my wife," and went with his son to the store to ask the people in that car why they had done so.

M. testified he did not see anything but heard his father yell for him after he was shot. He also testified he saw a flash. He then saw the other car drive off, and saw that the driver had a red jacket and gold teeth. He ran after the car and threw his cell phone at it. He remembered the driver with a gun but did not remember telling Detective Ramos that the man pointed it at him before M. threw the cell phone. He identified defendant as the driver in open court.

Elk Grove Police Detective Gabriel Ramos testified that V., M. and Y. all separately identified [Grey's] picture from a photographic lineup; M. was sure (10 out of 10), but V. and Y. were less sure (6 out of 10). When Ramos arrested [Grey] on December 18, 2006, [Grey] was wearing a red shirt and a gold grill with the letters "MVP" on his teeth. The screen saver on [Grey's] cell phone said "Meadowview Piru," and [Grey's] tattoos included "Piru" on his left forearm.

When Detective Ramos took V.'s statement, she did not mention that [Grey] had threatened her baby, and had said that M. was shopping with the family. M. had told Detective Ramos that he had actually seen the shooting, and that he had seen [Grey] point a gun at him. When interviewed on November 30, 2006, M. was wearing a red and white shirt and hat, and blue shorts with red trim.

3

Elk Grove Police Officer Paul Grant testified that when he arrived at the scene, the victim's truck was parked blocking several parking spaces. The victim had a bullet hole in his shoulder and was taken to the hospital. Officer Grant spoke with M., who said he had been shopping with his father and the rest of the family before he and his father returned to the store. M. told Officer Grant that he saw his father punch the man in the face, the man fired two shots at his father, then M. pushed his father out of the way and threw his cell phone at the man's head.

The parties stipulated that the Meadowview Piru is a criminal street gang, and that Detective Robert Strange would testify that [Grey] "is a validated member of the Meadowview Pirus also known as the Bloods." The trial court then instructed the jury as follows:

"You may consider evidence of gang activity only for the limited purpose of deciding whether the Defendant acted with the intent, purpose and knowledge that are required to prove the gang-related crimes and enhancements, or the Defendant had a motive to commit the crimes charged, or the Defendant actually believed in the need to defend himself, or the Defendant acted in the heat of passion.

"You may also consider this evidence when you evaluate the credibility or believability of a witness. And when you consider the facts and information relied on by an expert witness in reaching his opinion, you may not consider this evidence for any other purpose. You may not conclude from this evidence that the Defendant is a person of bad character or that he has a disposition to commit crime."

This limiting instruction was also read to the jury after closing arguments were delivered.

Elk Grove Police Detective Robert Strange testified as a gang expert without objection. He described the Meadowview Piru gang, how the police validate members, and testified its members used violence to gain respect. "[T]ypically in the gang subculture[,] power and influence and respect . . . are gained through the commission of acts of violence." "[T]he thing most important, is the ability to commit violence and the willingness to do so and actually committing those acts of violence." This causes the community to fear gang members and discourages crime reports. In his opinion the instant offenses were gang-related, because defendant injected mention of the Piru into a verbal spat for intimidation and to increase his stature. A gang member such as [Grey] could not allow his dignity to be challenged, therefore he had to respond to the victim's punch with a firearm or "he would have looked like a punk." "He has that gun to shoot somebody with it. You know, it's so many times people conveniently say it's self-defense when they shoot people in these situations. But that was an opportunity that presented [itself,] that now instead of fighting this guy, I'll just shoot this guy." Gang members typically will escalate violence, and respond to a punch with a weapon or by having a group beat the person up: "It's not going to be a fair fight."

There was evidence that at the time of his arrest [Grey] had a "teardrop" tattoo on his face, which he had not had on April 6, 2006; Detective Strange opined

4

that if defendant had not had it before the shooting on October 10, 2006, that might be a sign, understood by gang members, that [Grey] had shot someone, a kind of badge of achievement. However, he conceded this was his "gut feeling" and "nobody has really given me a set answer on it."

*Defense Case*

Vanessa Pedroza Grey, [Grey's] girlfriend at the time of the shooting, but wife at the time of trial, testified she was in her car during this incident, along with her daughter A. (aged 4) and her two sisters, I. (aged 11) and G. (aged 17). She was also pregnant with [Grey's] child. She heard Y. and G. arguing, both were being rude and threatening, and she heard Y. say "I'll beat your ass, Blood, or something." [Vanessa] testified she told her sister to go into the store, that it was not worth fighting over, but when G. went to the store with the younger girls, and Y. got back into the truck, Y.'s mother "started mouthing off," saying "Puerto Rican pride" and "fuck you, bitch. All kinds of stuff." [Grey] had not said anything during this time. He then said "be quiet. No one is even saying nothin'. Nobody is trying to argue with you." [Vanessa] then told Y.'s mother V. to "get out [of] the car then," meaning come out to fight, or "put up or shut up[.]" At about this point V. said she was going to call her "boyfriend/husband something" and [Vanessa] saw V. make a phone call from inside the truck. About 8 to 10 minutes later the victim came from the store, looked at the people in [Vanessa's] car, loaded his groceries and drove away, but then he stopped nearby and made a telephone call from inside his truck. He circled the truck by [Vanessa's] car "and the little girl and the mom were arguing, just still yelling stuff out." [Vanessa] threw a juice at the truck "so they would leave" but her juice fell short. [Grey] never threatened anybody, and never mentioned gangs, all he did was tell V. to be quiet.

[Vanessa] testified that after a period of calm, in about five minutes, the truck returned, blocking her car. But before the truck did that, she had become concerned about a "green Escalade or Tahoe SUV" that was circling the parking lot, driven by a "dark-skinned bald-headed Mexican guy" that had loud music playing. She also mentioned a black sedan behind the victim's truck. The victim came running toward [Vanessa's] car, opened the driver's side door "and he punches Aaron and kicks him 'cause his foot is in my car." Then she saw the victim's son M. coming, "he's yelling for someone to come this way. And then I just hear a gunshot." M. threw something at [Vanessa's] car and [Grey] had to hit the victim's truck in order to drive off. [Vanessa] called her sister, G., who was still in the store, and told her to stay there, then [Vanessa] and [Grey] left.

[Vanessa] claimed [Grey] got the teardrop tattoo before this incident, in June 2006. When contacted by the police about one month after the shooting, she lied and told them the man in her car was Marcus Johnson; she did this to protect [Grey] and because Detective Ramos threatened to take away her daughter, and also to protect her sister, who had already spoken to the police.

Elk Grove Police Officer Chris Reece testified that the victim said he became mad on the way home from the store when his wife told him a Hispanic woman had called her a "fucking bitch," and after dropping his family off at home he took his son

5

back to the store to confront the people.  V. told the officer that her husband was quick to anger.

*Rebuttal*

Detective Ramos testified that [Vanessa] was evasive when he interviewed her, and she claimed that "Marcus Johnson" was in the car with her on the night of the shooting.  She told him that the people in the truck had been saying things like "Puerto Rican this, Puerto Rican this. L.A. this," and someone in the truck referred to Bloods, "Blood this, Blood that."  The next day, when Detective Ramos confronted [Vanessa] about lying, she began to cry and claimed she was afraid "of Marcus and his gang."  He conceded that surveillance video showed a Tahoe circling the parking lot and a black sedan, as [Vanessa] had described.[2]

## II.  GROUNDS PRESENTED/DEFENSES

In his Petition, Grey presents three grounds for relief:  (1) the trial court erred in not bifurcating the gang-related evidence; (2) the denial of his motion for a new trial on the basis of the trial court's failure to bifurcate the gang-related evidence violated due process; and (3) by not objecting to the inadmissible testimony of the gang expert, Grey's trial counsel rendered ineffective assistance of counsel.  Respondent does not assert any affirmative defense.[3]

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

---

[2] *Grey*, 2008 WL 5394045 at *1-5 (alterations added).  Except for the petitioner's name, this appears exactly as it does in the original.

[3] *See* Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(b) (2011).

proceeding."[4]  The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

time of the relevant state-court decision."[5]  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.[6]  Thus, where holdings of the Supreme Court

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'"[7]  When a claim falls under the

"unreasonable application" prong, a state court's application of Supreme Court precedent must

be "objectively unreasonable," not just "incorrect or erroneous."[8]  The Supreme Court has made

clear that the objectively unreasonable standard is "a substantially higher threshold" than simply

believing that the state-court determination was incorrect.[9]  "[A]bsent a specific constitutional

violation, federal habeas corpus review of trial error is limited to whether the error 'so infected

---

[4] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[5] *Williams*, 529 U.S. at 412 (alteration added).

[6] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[7] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[8] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[9] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

the trial with unfairness as to make the resulting conviction a denial of due process.'"[10]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[11]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[12]

The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.*  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[13]

---

[10] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[11] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[12] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[13] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[14]  State appellate court decisions that summarily affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[15]  This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[16]  Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[17]  This presumption applies to state-trial courts and appellate courts alike.[18]

---

[14] *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[15] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[16] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[17] 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." (citing 28 U.S.C. § 2254(e)(1))).

[18] *See Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004) ("Stevenson does not address these factual findings, let alone challenge them with clear and convincing evidence. Accordingly, we presume them to be correct." (citing 28 U.S.C. § 2254(e)(1); *Pollard v. Galaza*, 290 F.3d 1030, 1035 (9th Cir. 2002))).

IV.  DISCUSSION

Grounds 1 and 2:  Failure to Bifurcate Gang-Related Enhancement Charge

Prior to trial, the trial court denied Grey's motion to bifurcate the gang-related charges.

In his first ground, Grey contends that the trial court erred because: (1) Grey's only reference to

gang membership was made to the victim's wife and daughter while the victim was not present;

(2) there was no evidence that the victim knew of Grey's gang membership; (3) the attempted

murder of the victim was remote to the gang comments because the shooting did not occur until

approximately thirty-minutes later when the victim returned to the scene of the initial altercation;

(4) Grey never bragged about the shooting to gang members; and (5) the victim was not affiliated

with a gang and, therefore, there was no gang rivalry present in the situation.  Grey argues that,

because it tarnished his credibility, he was unable to testify, thereby preventing him from

presenting a persuasive self-defense theory.  Grey contends that this error denied him the right to

a fair trial and due process.

After the jury verdict, Grey moved for a new trial in which, as the California Court of

Appeal noted, Grey essentially replicated the same arguments made in his motion to bifurcate the

gang-related charges.  The trial court denied the motion.  In his second ground, Grey relies for the

most part on his argument in support of his first ground.  What Grey does not do is present any

argument as to why the denial of his motion for a new trial was erroneous as a question standing

alone from his first ground, or any argument that entitles him to relief independent of the relief to

which he is entitled if he prevails on the first ground.  That is, if Grey prevails on the first

ground, he is entitled to a new trial.  On the other hand, if Grey does not prevail on the first

10

ground, there is no independent basis upon which he could be granted relief under his second

ground.  Consequently, the second ground is superfluous.

The California Court of Appeal, also viewing his grounds as being inextricably

intertwined, rejected Grey's arguments in their entirety, holding:

> [Grey's] view on appeal, expressed in each of his three contentions of error, is that although the jury *rejected* the allegation that the shooting was for the benefit of the gang, the gang evidence was so prejudicial as to unfairly induce the jury to reject his self-defense and provocation theories, and convict him despite the evidence.
>
> Generally, we draw the opposite conclusion:  The fact the jury *rejected* the gang enhancement shows that its collective passions were not so inflamed that it was unable to fairly evaluate the evidence in the light of the instructions.  With this general statement of our views, we now analyze each of [Grey's] specific claims of error.

### I.  Motion to Bifurcate

> At first, defense counsel conceded the admissibility of expert testimony about gangs.  Later, after the trial court brought the case of *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran* ) to the attention of the parties, the defense moved to bifurcate the gang enhancements.  After a pretrial hearing (Evid.Code, § 402) at which Detective Strange testified consistent with his trial testimony recounted above, the trial court denied the motion, finding that the gang evidence was directly relevant to the charged crimes:
>
> "[B]ecause Mr. Grey . . . was willing to take what was a verbal altercation between women and interject himself and actually threaten death and mentioned that it was all about Piru casts an entirely different indication over what occurred then some 30 minutes later.  [¶] . . .
>
> "[I] think the detective's testimony was very critical because it was his opinion that Mr. Grey, under these circumstances, cannot do anything other than ratchet up or increase the reaction to what is a fist fight.  And I do think that is a triable issue in this case for a jury to determine whether or not, in fact, Mr. Grey acted reasonably.
>
> "And I think it would be unfair and nothing short of hiding the truth from this jury if they were not to consider the role that Mr. Grey's gang membership and gang activity plays in determining whether or not he acted reasonably under these circumstances . . . .  [¶]  . . .  [¶]
>
> ". . . I believe it is very distinguishable from *Albarran,* the facts in this case, and it is substantially more probative than prejudicial to permit the jury to hear this evidence from this detective."
>
> We review an order denying bifurcation for an abuse of discretion.  (*People v. Albillar* (2008) 162 Cal.App.4th 935, 942 (*Albillar* ).)  The burden is on the party

seeking bifurcation to show a substantial danger of prejudice. (*Id.* at p. 943.) The trial court properly concluded that the evidence of [Grey's] gang membership and the culture of the gang was admissible to show his intent and motive and therefore no purpose would be served by bifurcation. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050 (*Hernandez* ).)

In *Albarran, supra,* 149 Cal.App.4th 214, a divided panel of the Second District Court of Appeal concluded that a new trial motion should have been granted in a drive-by shooting case, because inflammatory gang evidence had been introduced, but there was little or no gang connection to the crime, only the fact that Albarran belonged to a violent gang whose "members gain respect by committing crimes and intimidating people." (*Id.* at pp. 220-221.) In addition (p. 221):

> "Deputy Gillis opined that the shooting . . . intended to benefit the 13 Kings street gang because: (1) the shooting occurred in [the gang's territory]; (2) it occurred at a party and gang members often commit crimes during parties; and (3) more than one shooter was involved. Deputy Gillis stated that when these crimes were committed the 13 Kings were involved in an active gang war. Deputy Gillis also testified that [a victim] was a member of another gang, the Pierce Boys Gang, but he admitted he was unfamiliar with the Pierce Boys Gang, and knew of no rivalry between Albarran's gang and the Pierce Boys Gang."

The *Albarran* majority concluded the denial of a new trial motion was an abuse of discretion because "there was insufficient evidence to support the contention that this shooting was done with the intent to gain respect. On the contrary, the motive for the underlying crimes . . . was not apparent from the circumstances of the crime . . . . There was no evidence presented that any gang members had 'bragged' about their involvement or created graffiti and took credit for it. In fact, at the [Evidence] section 402 hearing Deputy Gillis conceded he did not know the reason for the shooting, though he had 'heard' that gang members were present at the party. There is nothing inherent in the facts of the shooting to suggest any specific gang motive. In the final analysis, the only evidence to support the respect motive is the fact of Albarran's gang affiliation." (*Albarran, supra,* 149 Cal.App.4th at p. 227.)

Presiding Justice Perluss dissented in detail, but because the issues are so fact-bound, even assuming *Albarran* was correctly decided, the facts here are distinguishable. Here, as the trial court noted, there was evidence showing that defendant injected his gang status into the dispute with the victim's family, by using the gang's name (Piru) and stating that he was going to call other people to do violence to the victim's family. Thus, there was a direct linkage between the Piru gang and this dispute. Such direct linkage was absent in *Albarran*.

In *Hernandez, supra,* 33 Cal.4th 1040, the California Supreme Court upheld the denial of bifurcation where a gang member told a woman just before robbing her and her friend, "You don't know who you are dealing with," naming a street gang. (*Id.* at p. 1045.) The court found: "Much of the gang evidence here was relevant to the charged offense. Indeed, defendant Hernandez himself injected his gang status into the crime. He identified himself as a gang member and attempted to use that

status in demanding money from the victim." (*Id.* at pp. 1050-1051.)  This case is factually like *Hernandez,* because, like Hernandez, [Grey] injected his gang membership into what was otherwise nothing more than a rude verbal spat.

[Grey] segments the events of the night in question and argues there was no evidence he mentioned his gang involvement between the time the victim drove back to the store and the time of the shooting.  This may explain why the jury rejected the gang enhancement, but it does not change the relevance of the gang threat as it illuminated [Grey's] motive and intent.  Had the gang enhancement been bifurcated, because the gang evidence explained [Grey's] willingness to react to a punch by using a gun, it would have been admitted anyway, thus no purpose would have been served by bifurcation.  The gang issue was not merely "tangentially relevant" to the charged crimes, as [Grey] argues on appeal.

## II.  New Trial Motion

[Grey's] new trial motion largely replicated the claims tendered in his motion to bifurcate the gang enhancement, and argued that at the time of the shooting there was no evidence of gang threats by [Grey], because at that point he was simply sitting in his car when the victim ran up and punched him in the face.  The trial court denied the motion because only limited gang evidence was introduced and defendant "announced that he was a Meadowview Piru from the start;" had he not done so bifurcation would have been granted.  The trial court also noted the jury "was able to [ferret] out the distinction between the underlying crime and its enhancement by the verdicts which were ultimately rendered in this case.  So that I see this as bolstering rather than undercutting what was this Court's ruling in this case."

For the reasons that we reject the claim the bifurcation motion should have been granted, we reject the claim the new trial motion should have been granted.  We agree with the trial court that the fact the jury rejected the gang enhancement showed it was not unduly inflamed by [Grey's] gang membership, but could and did evaluate the evidence and apply the instructions dispassionately.

On appeal [Grey] faults the trial court for concluding the evidence bore on witness credibility.  Several of the witnesses were reluctant to testify or gave evasive answers, and the gang evidence helped explain why.  For example, the victim gave an improbable explanation to suggest he did not actually punch [Grey], claiming that after he ran up to [Grey's] car he simply put his hand on the top of [Grey's] car and it must have slipped.  The prosecutor conceded the victim punched [Grey], and the victim's fear of retaliation for having hit a gang member could explain his evasive testimony.

[Grey] claims we must review the denial of a new trial motion de novo.  There is some authority for this claim.  (*Albarran, supra,* 149 Cal.App.4th at p. 224, & fn. 7; see also *People v. Nesler* (1997) 16 Cal.4th 561, 582 & fn. 5 (lead opn. of George, C.J.) (*Nesler* ); cf. *People v. Ault* (2004) 33 Cal.4th 1250, 1260-1264.)  There is contrary authority:  In a recent California Supreme Court case, the court applied the abuse of discretion standard when reviewing the denial of a new trial motion based on due process claims.  (*People v. Hoyos* (2007) 41 Cal.4th 872, 917, fn. 27.)

We need not plumb the niceties of this doctrinal dispute.  Even reviewing the matter de novo, we would uphold the trial court's decision. No new trial was warranted.[19]

Initially, this Court notes that there is no constitutional prohibition to the admissibility of evidence that a defendant is a gang member.[20]  Thus, the question of whether the evidence of Grey's membership in a gang is admissible is solely an evidentiary one.[21]  The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."[22]  "The introduction of unfairly prejudicial evidence against a defendant in a criminal trial . . . does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice."[23]  "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."[24]  In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution."[25]  The Supreme Court has made clear that federal

---

[19] *People v. Grey*, No. C056825, 2008 WL 5394045 at *5-8 (Cal. Ct. App. Dec. 29, 2008) (some alterations added) (footnote omitted).  Except for the petitioner's name and the internal footnote, this appears exactly as it does in the original.

[20] *See United States v. Abel*, 469 U.S. 45, 54-55 (1984) (holding that evidence of gang membership was admissible under Federal Rule of Evidence 403).

[21] This Court also notes that a police expert may testify on gang affiliations as well as the attributes and consequences of gang membership.  *United States v. Hankey*, 203 F.3d 1160, 1167-69 (9th Cir. 2000).

[22] *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).

[23] *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998) (citations omitted).

[24] *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) (citation omitted); *see also Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

[25] *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

habeas power does not allow granting relief on the basis of a belief that the state-trial court incorrectly interpreted the state-evidence code in ruling on the admissibility of evidence.[26]  In this context, the Supreme Court has defined "the category of infractions that violate 'fundamental fairness' very narrowly," limiting them to specific guarantees enumerated in the Bill of Rights.[27] For example, the Supreme Court has barred the introduction of evidence in state court criminal proceedings that violated the Fourth Amendment (search and seizure),[28] Fifth Amendment (confessions),[29] Sixth Amendment (Confrontation Clause),[30] and Sixth Amendment (right to counsel).[31]

On the other hand, in deciding cases involving the Federal Rules of Evidence or federal evidentiary statutes, the Supreme Court is acting in its supervisory capacity over the lower federal courts.[32]  "'Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.'"[33]

---

[26] *McGuire*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

[27] *Id.* at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

[28] *Mapp v. Ohio*, 367 U.S. 643 (1961).

[29] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[30] *Crawford v. Washington*, 541 U.S. 36 (2004); *Pointer v. Texas*, 380 U.S. 400 (1965) (transcript of preliminary hearing without assistance of counsel to confront and cross-examine absent witness inadmissible).

[31] *Burgett*, 389 U.S. at 114-15 (evidence of prior conviction obtained in violation of Sixth Amendment right to counsel inadmissible).

[32] *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 ("It is beyond dispute that we do not hold a supervisory power over the courts of the several states." (quoting *Dickerson v. United States*, 530 U.S. 428, 438 (2000))).

[33] *Smith v. Philips*, 455 U.S. 209, 221 (1982) (citations omitted).

15

Initially, this Court notes that, although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation,[34] the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.  Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not.[35]

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code § 352, permits the exclusion of evidence if its probative value is "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."[36]  California employs a similar rule.[37]

---

[34] *See Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc) ("A particular abuse of discretion by a state court may amount also to a violation of the Constitution, but not every state court abuse of discretion has the same effect.").

[35] *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) ("It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of clearly established Federal law." (citing § 2254(d)(1)).

[36] *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and County of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009) ("The decision to admit potentially prejudicial evidence under Rule 403 is 'committed to the sound discretion of the trial court.'" (quoting *United States v. Blitz*, 151 F.3d 1002, 1008 (9th Cir.1998))).

[37] *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

In this case, the trial court also gave specific limiting instructions on the use of the gang-related testimony.  This Court assumes that the jury followed the limiting instructions it was given.[38]

In this case, Grey contends that, because the gang-related evidence tarnished his credibility, he was prevented from testifying on his own behalf.  Thus, according to Grey, he was denied a fair trial and due process.  In an analogous situation, the Supreme Court held that to preserve an objection to a trial court ruling that a prior felony conviction could be admitted, a defendant must actually testify.[39]  The Supreme Court noted:

> A reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context.  This is particularly true under Rule [403], which directs the court to weigh the probative value of [the evidence] against the prejudicial effect to the defendant.  To perform this balancing, the court must know the precise nature of the defendant's testimony, which is unknowable when, as here, the defendant does not testify.[40]

"Any possible harm flowing from a district court's *in limine* ruling permitting [the introduction of a defendant's gang membership] is wholly speculative."[41]  The Court added:  "a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify."[42]

---

[38] *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions." (citing *Richardson v. Marsh,* 481 U.S. 200, 211 (1987)); *see also Marsh*, 481 U.S. at 206 (noting the "almost invariable assumption of the law that jurors follow their instructions" (quoting *Francis v. Franklin*, 471 U.S. 307, 325, n.9 (1985))); *Abney v. United States*, 431 U.S. 651, 664-65 (1977).

[39] *Luce v. United States*, 469 U.S. 38, 42 (1984).

[40] *Id.* at 41 (alterations added).

[41] *Id.*

[42] *Id*. at 42.

This Court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[43]   Nor can this Court find that the state court unreasonably applied the correct legal principle to the facts of the Petitioner's case within the scope of *Andrade-Williams-Schriro-Richter*, *i.e.*, the state-court decision was not more than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable.  Grey is not entitled to relief under his first or second grounds.

Ground 3;  Ineffective Assistance of Counsel

Grey's trial counsel did not object to the introduction of the testimony concerning Grey's gang membership.  Grey contends that this constituted ineffective assistance of counsel.  The Court of Appeal rejected Grey's argument, holding:

> Relying largely on *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew* ), [Grey] contends the gang expert was improperly allowed to testify as to the "ultimate issues" in the case.  The claim is forfeited because trial counsel did not object in the trial court.  (Evid.Code, § 353; see *People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on another point by *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)   As a fallback, [Grey] contends trial counsel was incompetent because no *Killebrew* objection was made.
> > "To prevail on this claim, defendant must show his counsel's representation fell below an objective standard of reasonableness and, but for counsel's error, there is a reasonable probability of a more favorable outcome. [Citations.]  Further, defendant is not entitled to relief on direct appeal if the record does not show why counsel failed to act in the manner defendant challenges, unless there is no satisfactory explanation for counsel's conduct or counsel was asked for an explanation and failed to provide one." (*People v. Lizarraga* (2003) 110 Cal.App.4th 689, 693.)
> > [Grey] reads too much into *Killebrew.*  One court described the actual *holding* in *Killebrew* as follows:

---

[43] 28 U.S.C. § 2254(d).

"[A]n expert may properly testify about the size, composition, or existence of a gang; 'motivation for a particular crime, generally retaliation or intimidation'; and 'whether and how a crime was committed to benefit or promote a gang.' [Citing, inter alia, *Killebrew*.] . . .

"An expert, however, may not testify that an individual had specific knowledge or possessed a specific intent. [Citing *Killebrew*.] In *Killebrew,* the appellate court held an expert's opinion testimony was improper: 'Through the use of hypothetical questions, [the expert] testified that each of the individuals in the three cars (1) knew there was a gun in the Chevrolet and a gun in the Mazda, and (2) jointly possessed the gun with every other person in all three cars for their mutual protection. In other words, [the expert] testified to the subjective *knowledge and intent* of each occupant in each vehicle. Such testimony is much different from the expectations of gang members in general when confronted with a specific action. [¶] [The expert]'s testimony was the only evidence offered by the People to establish the elements of the crime. As such, it is the type of opinion that did nothing more than inform the jury how [the expert] believed the case should be decided. It was an improper opinion on the ultimate issue and should have been excluded.' [Citation.]

"In *People v. Gonzalez* (2006) 38 Cal.4th 932, 946-946[ ], the California Supreme Court stated, '[a]s did the court in [*People v. Gonzalez* (2005) 126 Cal.App.4th 1539], we read *Killebrew* [ ] as merely "prohibit[ing] an expert from testifying to his or her opinion of the knowledge or intent of a defendant on trial." [Citations.] Even if we assume, without deciding, that *Killebrew* is correct in this respect, it has no relevance here. [The expert witness] merely answered hypothetical questions based on other evidence the prosecution presented, which is a proper way of presenting expert testimony. "Generally, an expert may render opinion testimony on the basis of facts given '"in a hypothetical question that asks the expert to assume their truth."'" [Citations.]" [ ] The Supreme Court further stated, 'there is a difference between testifying about specific persons and about hypothetical persons. It would be incorrect to read *Killebrew* as barring the questioning of expert witnesses through the use of hypothetical questions regarding hypothetical persons.'" (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512-1513; see also *People v. Ward* (2005) 36 Cal.4th 186, 209-210.)

In this case, after testifying about the concept of "respect" in the gang culture, and that it is earned through violence, Detective Strange was asked a series of questions about his opinions about the charged crimes. His opinion was that by "interject[ing] himself" into the dispute and referencing his gang, [Grey] would improve his standing within the gang. When he was punched by the victim, he had to reply with greater force because "he had already made this gang statement, and he can't back away from that now." In the middle of a nearly four-page narrative answer to a question to which no objection was lodged, Detective Strange included this passage:

". . . If he got beat up that day by this guy, that word would have traveled back, too.  And in the eyes of gangsters he would have looked like a punk.  So because he had already announced Piru and being that he drove to the grocery store with females and kids with a gun . . . he looks like an opportunist gang member.

"To me he's look[ing] for an opportunity.  He has that gun to shoot somebody with it.  You know, it's so many times people conveniently say it's self-defense when they shoot people in these situations.  But that was an opportunity that presented [itself] that now instead of fighting this guy, I'll just shoot this guy."

After the long narrative was over, Detective Strange detailed his discussions with gang members about escalation of force.  In short, to preserve respect and frighten people, gang members "really overpower" their responses to situations; "If somebody comes up and punches you, as a gang member, you're not gonna just answer with just punching him back.  It's not going to be a fair fight. [¶] . . . And to answer it the way the Mr. Grey did is totally appropriate as far as the conversations I've had with gangsters."

On appeal [Grey] characterizes all of these passages as improper ultimate opinion evidence.

In our view, the quoted passage was proper expert opinion, based on the detective's knowledge of gang culture. Although the way some of the points were phrased may have been technically objectionable, the gist of the testimony was not that the detective knew what was in [Grey's] mind, it was that based on what he knew about gangs, including what gang members had told him about escalation of violence, the facts of this case as he understood them fit within the typical gang pattern. Had objections been lodged, at best the expert's testimony would have been recast, formally, to avoid couching his answers so directly in terms of [Grey's] thinking processes, but the gist of the testimony would have been the same. Therefore, because the essence of the testimony was bound to come in, defense counsel may rationally have concluded that no purpose would be served by lodging an objection that, at best, would merely have caused the testimony to be reworded, and would have called more attention to the testimony.  "Because the decision whether to object is inherently tactical, the failure to object to evidence will seldom establish incompetence." (*People v. Freeman* (1994) 8 Cal.4th 450, 490-491.)

Further, as stated, the jury was twice instructed about the limited admissibility of the gang evidence.  It is not reasonable to conclude that the jury would have abdicated its duty to determine the facts, including [Grey's] mental state, to the gang expert. Had the jury accepted the gang expert's testimony uncritically, it would have sustained the gang enhancement.  The fact it rejected that enhancement confirms that

it carefully evaluated all of the gang evidence in this case, and there is no reason to suppose it unfairly warped the jury's assessment of [Grey's] mental state.[44]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Grey must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[45]  A deficient performance is one in which counsel made errors so serious that "counsel was not functioning as the counsel guaranteed by the Sixth Amendment."[46]  Grey must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.[47]  An analysis that focuses "solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."[48]  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either one of the *Strickland* prongs.[49]

---

[44] *People v. Grey*, No. C056825, 2008 WL 5394045 at *8-10 (Cal. Ct. App. Dec. 29, 2008) (some alterations added).  Except for the petitioner's name, this appears exactly as it does in the original.

[45] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[46] *Id.*

[47] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985) (citing *Strickland,* 466 U.S. at 694).

[48] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmel v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." (citing *Strickland,* 466 U.S. at 687)); *United States v. Cronic*, 466 U.S. 648, 656 (1984) ("The right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." (citations omitted)).

[49] *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra,* at 473, 127 S.Ct. 1933.  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").[50]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d)(1) standard.[51]

The Supreme Court, applying the "doubly deferential standard," has made clear that when adjudicating ineffective assistance of counsel claims in federal habeas proceedings, unlike the situation on direct review, focus is not on whether counsel's performance fell below the *Strickland* standard.  Rather, the focus is on whether the state-court decision holding that counsel was not ineffective constituted an "*unreasonable* application of federal law[,][which] is different from an *incorrect* application of federal law."[52]

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.[53]

---

[50] *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009).

[51] *See id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

[52] *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

[53] *Id.* at 786.

In this case, the California Court of Appeal, in analyzing Grey's arguments, determined that the admission of the gang-related testimony was not erroneous.  The Court of Appeal also held that, even if the form of the testimony had been objected to, the substance of the testimony would still have been admissible and would have come in.  Because its admission was not erroneous and the substance of the testimony, if not its form, was admissible and would have been admitted in any event, Grey suffered no prejudice from the failure of his trial counsel to object, i.e., the outcome would not have been different.[54]

This Court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[55]  Nor, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state court unreasonably applied the correct legal principle to the facts of Grey's case within the scope of *Andrade-Williams-Schriro-Richter*, *i.e.*, the state-court decision was not more than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable. Grey has failed to establish that counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that his defense was prejudiced, as required by *Strickland-Hill*.  Grey is not entitled to relief under his third ground.

---

[54] *Strickland*, 466 U.S. at 694.

[55] 28 U.S.C. § 2254(d).

## V.  CONCLUSION AND ORDER

Grey is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[56]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[57]

The Clerk of the Court is to enter judgment accordingly.

Dated: December 21, 2011.

　　　　　　　　　　　　　　　  /s/ James K. Singleton, Jr.
　　　　　　　　　　　　　　　  JAMES K. SINGLETON, JR.
　　　　　　　　　　　　　　　  United States District Judge

---

[56] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705-06 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's  resolution of his constitutional claims or that jurists could conclude  the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[57] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.